# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs February 19, 2015

## STATE OF TENNESSEE v. JOSEPH JOHN VOLPE

**Appeal from the Criminal Court for Hamilton County**
**No. 278278     Barry A. Steelman, Judge**

_____

**No.  E2014-00655-CCA-R3-CD - Filed September 3, 2015**

_____

The Defendant, Joseph John Volpe, was found guilty by a Hamilton County Criminal Court jury of attempt to commit second degree murder, a Class B felony, aggravated assault, a Class C felony, and reckless endangerment, a Class E felony. *See* T.C.A. §§ 39-13-210 (2014) (second degree murder), 39-12-101 (2014) (criminal attempt), 39-13-102 (2010) (amended 2011, 2013) (aggravated assault), 39-13-103 (2010) (amended 2011, 2012, 2013) (reckless endangerment). The trial court sentenced the Defendant as a Range I, standard offender to concurrent sentences of ten years for attempted second degree murder, three years for aggravated assault, and one year for reckless endangerment. The court ordered the Defendant to serve eleven months, twenty-nine days in confinement and suspended the remainder of his sentence to probation. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions, (2) the trial court erred by denying his motions to suppress evidence, (3) the trial court erred by admitting inadmissible hearsay in evidence at the trial, (4) the trial court erred by admitting photographs at the trial, and (5) the prosecutor engaged in misconduct during closing argument. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

John Allen Brooks, Chattanooga, Tennessee, for the appellant, Joseph John Volpe.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; William H. Cox III, District Attorney General; and Lance Pope and David Schmidt, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

This case relates to an incident on Interstate 24 in Hamilton County in which one bullet was fired into Bruce Johnston's tractor-trailer truck. At the trial, Mr. Johnston testified that he had been a truck driver for twenty-eight years and that he had a "dedicated run," making four trips per week from Murfreesboro to Atlanta. On June 30, 2010, he left his home around 8:00 or 8:30 p.m. to drive to a location in Murfreesboro to pick up his load. On his way to Atlanta, traffic became heavy in Hamilton County as he approached the Germantown exit on Interstate 24. He said he moved from the center lane to the left lane of the three lanes of traffic to avoid a multi-car accident because of merging traffic, although that portion of the interstate restricted truck drivers from the left lane. He said that after he moved to the left lane, he saw a silver Toyota Camry with a Pennsylvania license plate about thirty to forty feet ahead of his truck. Mr. Johnston said the driver of the Camry reached his arm out of the window and motioned for Mr. Johnston to return to the center lane. Mr. Johnston motioned for the driver to "go on," but the driver again motioned for Mr. Johnston to move to the center lane. Mr. Johnston saw the driver looking in his driver-side mirror and said the driver tapped his brakes, slowing to about thirty miles per hour. Mr. Johnston admitted he became irritated and made an obscene gesture at the driver.

Mr. Johnston testified that he moved to the center lane using his signal when traffic cleared, accelerated, and passed the Camry, which was still in the left lane. Mr. Johnston drove in the center lane until he saw brake lights from cars ahead of him, and he again merged to the left lane. He saw the Camry accelerate and attempt to cut him off, and he "returned the favor and . . . brake-checked him." Mr. Johnston saw from his rear-view mirror that the Camry was in the center lane and about three or four tractor-trailer lengths behind.

Mr. Johnston testified that as he approached the Fourth Avenue exit, he heard a loud bang and felt a breeze near his head. He saw fabric and foam from the interior of his truck fly by his ear. He thought he had been shot at, but he was unsure. He looked in his passenger-side mirror and saw the Camry at his passenger door. He said the Camry passed, and he provided the car's license plate number to a friend, with whom he had been speaking on his cell phone before the incident began. The Camry exited the interstate and drove northbound. Mr. Johnston stopped his truck on the side of the interstate, left his truck, and inspected the exterior of his truck for bullet holes. He did not find any holes and returned to the cab of his truck. Inside the truck, however, he found a hole in the driver's seat that extended from the back of the seat through the front, and upon examination, he found a bullet in a rubber seal around a window vent. He described the bullet as mashed and mushroomed. He called 9-1-1 and waited for the police at a nearby convenience store.

Mr. Johnston testified that he brake-checked the driver of the Camry to send a message to the driver to back off. He said, though, brake-checking another vehicle was inappropriate because it might cause an accident. He identified photographs of his truck taken on July 1, 2010. The photographs depicted the items through which the bullet traveled inside the truck. One photograph depicted Mr. Johnston sitting in the driver's seat and showed a small hole just above his left shoulder marked with an ink pen. Another photograph showed holes in two jackets that had been draped around the driver's seat. Mr. Johnston identified other photographs of his truck taken on the side of the road about one month after the incident. The photographs showed a small hole on the rear side of the truck's cab near the window of the sleeping compartment.

The recording of the 9-1-1 call was played for the jury. In the recording, Mr. Johnston provided the dispatcher with his location at the convenience store and stated that someone had shot at him and that he had found a bullet inside the cab of his truck. The dispatcher asked if Mr. Johnston saw who shot at him, and Mr. Johnston said, "Yeah. It was a guy from Pennsylvania messing with me on the [i]nterstate. I got his tag number." Mr. Johnston said that the driver shot at him while driving on the interstate and that the man was driving a silver Toyota Camry. Mr. Johnston provided information regarding the exit taken by the driver of the Camry, the direction in which the car traveled, and the license plate number.

Mr. Johnston testified that he provided the police officers who responded to the convenience store a description of the Camry. He learned about ten minutes later that the Defendant had been stopped by the police in response to Mr. Johnston's reporting the incident. The police officers took Mr. Johnston to where the Defendant's car had been stopped, and Mr. Johnston identified the Defendant as the driver of the silver Toyota Camry. He agreed that the license plate number he provided the 9-1-1 operator was similar to the number on the Defendant's car.

Mr. Johnston testified that he had previously viewed a video recording found inside the Defendant's silver Toyota Camry. The recording was played for the jury. The recording shows the Defendant's car containing a video camera. The car was being driven on the interstate and following several eighteen-wheel trucks and other vehicles. A male voice is heard commenting on the distance between various trucks and other vehicles on the roadway and the trucks' speeds. A digital speedometer is mounted to the dashboard. The car reduced its speed, and the man twice yelled, "Get off my a--."

Mr. Johnston testified that neither his truck nor his interaction with the Defendant was depicted in the recording. He said the recording showed the car with the video camera was traveling eastbound on Interstate 24 toward Chattanooga. Mr. Johnston agreed that a portion of the recording showed the Defendant's car traveling westbound in the left lane. He agreed

the recording showed the Camry decelerated considerably at the location where the incident in this case occurred. He stated he first learned from the police officers who responded to his 9-1-1 call that the Defendant was recording truck drivers. He did not look inside the Defendant's car.

On cross-examination, Mr. Johnston identified a photograph of the interstate between the Fourth Avenue exit and the exit taken by the Defendant. He agreed that his truck was not supposed to travel in the left lane because of roadway restrictions. Although counsel noted traffic did not appear heavy in the recording, Mr. Johnston said that several cars were in the distance. Mr. Johnston noted traffic was heavy for that portion of interstate at that time of night. He denied he attempted to show the Defendant "who the big dog was" when he passed the Defendant and reentered the left lane. He agreed he told the person to whom he was talking on his cell phone, "Well, I guess he's had enough fun playing chicken with a big truck." He agreed he did not see the Defendant point a gun at his truck. He said that although the video recording showed the Defendant's car in the right lane, not the middle lane, he knew the Defendant's car was in the middle lane beside his truck ten seconds before the bullet entered his truck. He said that the Defendant moved to the right lane after the Defendant passed him.

Mr. Johnston testified that he brake-checked the Defendant because the Defendant was attempting to cut him off and agreed that he should not have done it. He said that by that time, the truck restriction had ended and that he was permitted to travel in the left lane. He conceded some of the photographs of his truck might have been taken two months after the incident. He said his wife took the photographs. He said that although he did not see the Defendant fire a gun at his truck, he instinctively thought the Defendant was the shooter because he was the only driver with whom he had an altercation and because the Defendant's car was on the right side of his truck at the time of the shooting. He said that although he saw the Defendant to his right, he did not see the Defendant with a gun. He agreed that in the 9-1-1 recording, he told the operator that he knew who shot at him.

Mr. Johnston testified that for a "split second" he thought the shooting could have been the result of a stray bullet from Eastlake Courts, which was described as an unsafe area nearby. He agreed he traveled in the left lane twice when it was prohibited. He agreed he called 9-1-1 at 8:52 p.m. and said it was "dusky dark" when he placed the call. On redirect examination, he noted that in the video recording, it was darker outside at the beginning of the recording than a few minutes afterward and agreed that the recording looked as though it had been altered.

-4-

Chattanooga Police Officer Victor Miller testified that he responded to Mr. Johnston's location at the convenience store. He spoke to Mr. Johnston and waited for Officer Frisbee, the primary investigating officer, to arrive. He learned another officer had located a car matching the description provided by Mr. Johnston. He left the convenience store and drove to where the driver of the car matching the description was being detained. He remained in his car and only provided backup to the other officers. He said that the Defendant's car had a Pennsylvania license plate and that the number provided by Mr. Johnston was correct except for one character.

On cross-examination, Officer Miller testified that he did not recall if Mr. Johnston told him that he saw who shot at him. He recalled, though, Mr. Johnston reported being shot at by someone from a moving car. Officer Miller did not question the Defendant or seize any property from the Defendant's car. He did not know if a gunshot residue analysis was conducted. He said the Defendant was polite to the officers and was not disorderly or disruptive.

Chattanooga Police Officer Gary Frisbee testified that he responded to the convenience store and spoke to Mr. Johnston, who told him that he was in an altercation with another driver and that he heard a gunshot. Mr. Johnston told him that the other driver was in a silver Toyota Camry with a Pennsylvania license plate, and Mr. Johnston provided the plate number. Mr. Johnston's truck was examined by Officer Frisbee, who saw damage to the driver's side headrest and the exterior rear of the truck's cab. Officer Frisbee thought the damage was caused by a bullet. Inside the truck, Officer Frisbee found the bullet. He said Officer Cornelius Gaines located the silver Toyota Camry on the same roadway Mr. Johnston reported during the 9-1-1 call.

Officer Frisbee identified photographs of the exterior and interior of the Defendant's car, which included a "setup for a camera . . . mounted in the vehicle." Officer Frisbee was unable to remove the system from the car, which was mounted to the center of the car and extended to the front passenger-side area. The system included a tripod and a camera. He also identified a photograph of a GPS system, and Officer Frisbee said three GPS units were inside the car. Another photograph showed one cartridge casing just inside the front passenger-side door. A second cartridge casing was found "at the front of the passenger seat." Officer Frisbee stated that he found a semiautomatic Ruger handgun in the glove box and a recording from the camera mounted to the dashboard. He said the handgun magazine clip contained unfired, live rounds.

On cross-examination, Officer Frisbee testified that the Eastlake Court area involved many shots-fired calls. He said that he did not request the Defendant undergo a gunshot residue analysis of his hands and his clothes. Officer Frisbee did not smell gunshot residue inside the car.

Officer Frisbee testified that Mr. Johnston reported he was talking to someone at the time of the shooting, although the officer could not recall if the victim was talking on his cell phone or the Citizens Band (CB) radio. He agreed that the Defendant had a permit to carry a firearm issued by the State of Georgia and that the Defendant was lawfully carrying his gun that night. He clarified that one cartridge casing was found on the rear driver's side of the car and one cartridge casing was found on the passenger side. He agreed the cartridge casings could have been inside the car for weeks.

On redirect examination, Officer Frisbee testified that gunshot residue odor dissipated quickly and that one or two gunshots would not leave behind an odor when a car window was lowered. He reviewed the police telephone calls from June 30, 2010, and found no other reported shots-fired calls in the area. On further recross-examination, he agreed Mr. Johnston did not report seeing who fired at his truck, only that he had an altercation with another driver.

Chattanooga Police Officer Cornelius Gaines testified that he responded to the convenience store where Mr. Johnston was located. He examined Mr. Johnston's truck and saw a single bullet hole. Mr. Johnston told him that he thought he was shot at by the driver of a silver Toyota Camry with tinted windows and a Pennsylvania license plate. Mr. Johnston reported where the driver of the Camry exited the interstate. After Officer Gaines left the convenience store, he saw a silver Camry with tinted windows and a Pennsylvania license plate. He compared the license plate number provided by Mr. Johnston, and he recalled the number was correct except for one character. He initiated a traffic stop. The Defendant was stopped thirteen minutes after Officer Gaines arrived at the convenience store.

On cross-examination, Officer Gaines testified that although he could not recall the Defendant's demeanor, the Defendant stopped his car without incident. Officer Gaines agreed the police received many shots-fired calls regarding that area of town.

Mark Hamilton, an expert in video extraction analysis, testified that he worked for the police department as a civilian employee assigned to the special investigations unit and that his work involved electronic equipment. He received a mini DVD recovered from the Defendant's car. He recovered from the disc two video files and two information files, but the information files were corrupted.

-6-

The parties stipulated that the March 30, 2012 Tennessee Bureau of Investigation (TBI) latent fingerprint report showed no "identifiable latent prints" on the firearm, magazine clip, and seven cartridges recovered from the Defendant's car.

TBI Special Agent Alex Brodhag, an expert in firearms and ballistics analysis, analyzed the items seized from the Defendant's car. He analyzed a nine-millimeter Ruger pistol, a magazine clip, seven unfired nine-millimeter cartridges, and two fired nine-millimeter cartridge casings from the Defendant's car. He also analyzed one fired jacketed bullet from the victim's truck. He concluded that the two cartridge casings found inside the Defendant's car were fired from the handgun found inside the glove box. The jacketed bullet found inside Mr. Johnston's truck was damaged after hitting another surface, and Agent Brodhag concluded that the fired jacketed bullet was consistent with a nine-millimeter caliber bullet. He concluded that the fired jacketed bullet had similar class characteristics as the test-fired bullet from the Defendant's handgun. However, he was unable to determine if the fired bullet came from the handgun found in the Defendant's car because of the damage caused by the impact.

On cross-examination, Agent Brodhag testified that the fired jacketed bullet could have been fired from a .357-caliber gun if the gun had similar rifling. He said it was also possible the bullet was fired from a .38-caliber gun. He agreed that jacketed bullets were made for .357-caliber, .38-caliber, and .380-caliber guns and that each of those guns used the same caliber bullets. He could not conclude that a "shell was fired" from the handgun submitted for analysis.

On redirect examination, Agent Brodhag testified that although he could not determine if the fired bullet came from the handgun found inside the Defendant's car, he also could not determine if the bullet was fired from any other handgun because of the damage to the bullet. He agreed, though, the weight and the size of the fired bullet were consistent with the gun found in the Defendant's car. He also said that the fired bullet was from the same type of cartridge as the unfired cartridges found inside the Defendant's car.

Robert Viso, Jr., testified for the defense that at the time of the offense, he was the Vice President of Safety for U.S. Express. He hired the Defendant as a "Third Eye Safety" to observe U.S. Express truck drivers and to record drivers who violated the company driving policy. The Defendant's job duties included recording drivers who violated the speed limit, followed other vehicles too closely, and made erratic lane changes. Mr. Viso said this service was common practice in the trucking industry.

On cross-examination, Mr. Viso testified that his business relationship with the Defendant began as a result of the Defendant's contacting Mr. Viso after the Defendant observed a truck driver driving erratically. The Defendant provided a video recording of the driver. Although Mr. Viso already employed a service provider for the Georgia-Alabama-Tennessee region, he offered to hire the Defendant for local observation. He learned of the June 30, 2010 incident from someone employed at U.S. Express. He agreed he did not know any details about the incident.

Mr. Viso testified that observation companies were asked not to engage with truck drivers and that they were only authorized to video record and monitor the drivers. The operation was supposed to be covert without the drivers' knowing they were being monitored. He agreed that yelling and gesturing to a driver was inappropriate.

Upon this evidence, the Defendant was convicted of attempt to commit second degree murder, aggravated assault, and reckless endangerment. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions because the State failed to present any direct evidence against him. He raises a general argument that the circumstantial evidence is insufficient to support his convictions and that the verdicts are contrary to the weight of the evidence. He does not argue in his brief that the State failed to prove beyond a reasonable doubt any of the elements of the offenses or to establish the perpetrator's identity. In any event, we conclude that the evidence is sufficient.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

A defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2). Second degree murder is defined as a knowing killing of another. *Id*. § 39-13-210(a)(1); *see id.* § 39-11-106(a)(20) (Supp. 2009) (amended 2011, 2014). Second degree murder is a result-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). Therefore, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b) (2014). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787. Intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93.

Assault is defined as intentionally or knowingly causing another person to reasonably fear imminent bodily injury. T.C.A. § 39-13-101(a)(2) (2010) (amended 2013). A defendant commits aggravated assault, in relevant part, by intentionally or knowingly committing an assault and by using or displaying a deadly weapon. *Id*. § 39-13-102(a)(1)(B). Likewise, a defendant is guilty of reckless endangerment when he "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." *Id*. § 39-13-103(a); *see id.* at (b) (stating reckless endangerment committed with the use of a deadly weapon is a Class E felony). "[T]he person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger." *State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999). The "zone of danger" is used "to define that area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury if others were present in that zone or area." *Id*.

In the light most favorable to the State, the record reflects that Mr. Johnston was involved in an altercation with the driver of a silver Camry with tinted windows and a Pennsylvania licence plate because Mr. Johnston drove his truck in a restricted lane. After Mr. Johnston passed the Camry and thought the altercation had apparently ended, Mr. Johnston saw the Camry to his right and heard a gunshot seconds later. The evidence reflects that a bullet entered the rear of the truck's sleeping compartment, traveled through the driver's seat headrest, and lodged in the rubber seal of the window vent. The bullet narrowly missed Mr. Johnston. Mr. Johnston called 9-1-1 to report the incident, and he provided the dispatch officer with a description of the Camry, the Pennsylvania license plate number, the

interstate exit taken by the Camry, and the direction in which the car traveled. Minutes later, the police stopped a car matching the description provided by Mr. Johnston, and the license plate number provided by Mr. Johnston was correct except for one character.

A search of the Defendant's car resulted in the seizure of a nine-millimeter Ruger handgun and two fired nine-millimeter cartridge casings. TBI Special Agent Brodhag concluded that the two fired cartridge casings were fired from the Ruger found in the glove box of the Defendant's car. Although the bullet recovered from Mr. Johnston's truck was damaged, Agent Brodhag concluded that the bullet was consistent with nine-millimeter ammunition, that the size and the weight of the bullet were consistent with the caliber of ammunition required for the Defendant's handgun, and that the bullet had the same class characteristics as the test-fired bullets from the Defendant's handgun. We conclude that sufficient evidence exists showing that the Defendant was the driver of the Camry involved in the altercation with Mr. Johnston and that the Defendant fired the handgun at Mr. Johnston's truck.

Relative to the attempt to commit second degree murder, the record reflects that the Defendant fired a gun at Mr. Johnston's truck while traveling on Interstate 24 while other drivers were on the roadway. We note that a bullet entered the truck and traveled through the driver-side headrest where Mr. Johnston was sitting. The Defendant's firing a gun at Mr. Johnston's truck shows that the Defendant acted with an awareness that his conduct was reasonably certain to cause Mr. Johnston's death.

Relative to aggravated assault, Mr. Johnston testified that he thought he had been shot at when he heard a loud bang, felt a breeze near his head, and saw fabric and foam fly by his head. Although he was not sure immediately he had been shot at, he was scared and shaken after he realized a bullet traveled through his seat, missing him by a few inches, which is reflected in the 9-1-1 recording. Aggravated assault committed by using or displaying a deadly weapon is a nature of conduct offense and "focuses on the defendant's conduct of using or displaying a weapon, rather than the result from that conduct." *State v. Szumanski Stroud*, No. W2006-01945-CCA-R3-CD, 2007 WL 3171158, at *5 (Tenn. Crim. App. Oct. 29, 2007). We note that Mr. Johnston testified that he feared being shot at again when the Defendant drove past Mr. Johnston. *See State v. Barry Smith, Julian Kneeland, and Barron Smith*, No. W2011-02122-CCA-R3-CD, 2013 WL 6388588, at *14 (Tenn. Crim. App. Dec. 5, 2013) (stating that "fearfulness may be shown by a concern for self-defense, the inability to concentrate, and turning to the police for help"). Based on the evidence, the jury could have inferred that the Defendant was aware his conduct was reasonably certain to cause Mr. Johnston to reasonably fear imminent bodily injury.

Relative to reckless endangerment, the evidence reflects that Mr. Johnston was driving on Interstate 24 at a time when other drivers were on the roadway. Mr. Johnston testified about the traffic at the time of the shooting, and he discussed having to move to the left lane to avoid an accident on one occasion. The Defendant's shooting at Mr. Johnston's truck placed the other drivers traveling near Mr. Johnston in imminent danger of death or serious bodily injury. Mr. Johnston foreseeably could have wrecked his truck had the Defendant successfully shot Mr. Johnston, which placed other drivers in the vicinity in the zone of danger. Likewise, the Defendant could have missed Mr. Johnston's truck and shot another vehicle or person entirely. We conclude that the evidence is sufficient to support the convictions. We, likewise, conclude relative to the argument that the verdict is contrary to the weight of the evidence that the trial court approved the jury's verdicts as the thirteenth juror. *See* Tenn. R. Crim. P. 33(d). The Defendant is not entitled to relief on this basis.

## II

## Motion to Suppress Evidence

The Defendant contends that the trial court erred by denying his two motions to suppress evidence. In the first motion to suppress, the Defendant sought to exclude evidence of the show-up identification made at the scene of his arrest on the ground that the procedures were impermissibly suggestive. In the second motion to suppress, the Defendant sought to exclude all of the items seized from his car on the ground that the police had no probable cause to stop his vehicle because he had not committed any traffic violations. The State responds that the court properly denied the motions. We agree with the State.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

## A. Show-Up Identification

On February 27, 2012, a suppression hearing was held relative to whether the show-up identification at the scene of the Defendant's arrest was unnecessarily suggestive. Joseph Johnston's testimony regarding the events on June 30, 2010, before the shooting was similar to his trial testimony. He said that after fabric and debris flew in his face, he saw the silver Toyota Camry on the right side of his truck. The Camry was in the middle lane, and Mr. Johnston was in the left lane. He said the driver, whom he identified as the Defendant, turned and looked at him as the Camry passed but made no effort to "get away" from the area. He heard from the CB radio, "Is he shooting at you?" or "He just shot at you." Mr. Johnston provided similar testimony regarding his examining his truck, exiting the interstate, and calling the police.

Mr. Johnston testified that he obtained and provided the police officers with the Pennsylvania license plate number and that he obtained "a good look" at the Defendant when the Camry passed his truck. The driver-side window was down when the Camry passed, and the Defendant looked over his left shoulder at Mr. Johnston. Mr. Johnston also said he saw the Defendant's face from the Camry's rear-view mirror at the beginning of the incident.

Mr. Johnston testified that the police officers took him to a nearby parking lot about two miles from the convenience store. Although Mr. Johnston did not get out of the police car, he identified the Defendant as the driver of the Camry. He said the officers opened the car door, hovered around him, and asked, "Is that the car?" He identified the Camry. Although an officer asked if any passengers were inside the car, Mr. Johnston said the dark-tinted windows prevented his seeing into the backseat of the Camry. He knew, though, nobody was sitting in the front passenger seat. He said the identifications occurred approximately twenty minutes after the shooting. The 9-1-1 recording was played for the trial court.

On cross-examination, Mr. Johnston testified that after he was forced into the left lane to prevent a collision, he saw the Camry about one or two minutes later. He denied he was speeding. He said that he was "very observant about [his] surroundings at all times" and that he knew cars and paid attention to them because he was a retired automotive mechanic. He said that the Defendant had his full attention after the Defendant brake-checked his car. Mr. Johnston commented to his friend on the phone that the Defendant was attempting to make him change lanes.

Mr. Johnston testified that as he passed the Defendant's car, he saw the passenger-side window going down, that he glanced at the Defendant's car, and that he continued to drive. He said that about eighty feet separated the Defendant's car and his truck when he saw the

Defendant's face in the Camry's rear-view mirror. He denied seeing the Defendant's face when he passed the Camry as the passenger-side window was going down. Mr. Johnston said that he returned to the left lane after passing the Camry, that the Defendant "got on his bumper," and that Mr. Johnston brake-checked the Defendant. The Defendant moved into the middle lane and reduced his speed, which created about two or three tractor-trailer lengths between the vehicles. Mr. Johnston forgot about the Defendant and continued to talk on the telephone. As Mr. Johnston passed the interstate exit for Fourth Avenue, he heard a gunshot. He did not see anyone point a gun at him and said the gunshot came from behind. He agreed he inferred the gunshot came from the Camry. After the gunshot, he saw the Camry pass him on the right and the Defendant turn and look at him. The driver's window of the Camry was rolled down.

Mr. Johnston testified that his CB radio was turned on but that the volume was low. Although he did not use the radio much, he listened to the chatter relative to traffic. He heard one of the truck drivers say, "He shot at you" or "Is he shooting at you?" He did not respond because he was on the phone with his friend repeating the Camry's license plate number.

Mr. Johnston testified that after the police arrived at the convenience store, Officer Frisbee told him, "Stay put, we've got him stopped." The officers investigated the license plate number provided by Mr. Johnston, but the number was not completely correct. Mr. Johnston knew the last four characters he provided were correct. He told the officers that the driver was a Caucasian male with dark hair and a goatee. An officer asked Mr. Johnston to ride with him to the location where the Defendant had been detained. After they arrived, Mr. Johnston saw the Camry in an AutoZone parking lot. Several police cars were there, and Mr. Johnston said the Defendant stood on the sidewalk near a police car. He recalled the Defendant's wearing handcuffs. He said three officers opened the door of the car in which he was sitting, hovered around him, and asked if "that was the car." He identified the car and the Defendant as the person who shot at him. He said a spotlight was not on the Defendant when he made the identifications and recalled the parking lot lighting was as bright as the courtroom.

Chattanooga Police Officer Gary Frisbee provided similar testimony relative to his learning of the incident, responding to Mr. Johnston's location at the convenience store, and his interaction with Mr. Johnston. Relative to the identification of the Defendant, Mr. Johnston provided a license plate number, said the Camry had a Pennsylvania license plate, and identified the driver as a Caucasian male. He said that about thirteen or fourteen minutes after the be on the lookout alert was issued, another officer located the Camry on the same road Mr. Johnston reported seeing the Camry exit the interstate.

-13-

Officer Frisbee testified that he left the convenience store and drove to the Defendant's location. When he arrived, he saw a silver Toyota Camry with a Pennsylvania license plate and noted the plate number matched the one provided by the victim except for one character. The Defendant was the only person inside the car. Officer Frisbee requested another officer drive Mr. Johnston to that location for an identification. Mr. Johnston identified the car and the Defendant, and the Defendant was arrested.

On cross-examination, Officer Frisbee testified that he did not recall Mr. Johnston's stating the driver of the Camry had a goatee but said it was possible Mr. Johnston provided the additional detail. He recalled Officer Gaines stopped the Defendant's car. Relative to the search of the Defendant's car, Officer Frisbee said that he participated in the search, which occurred after the arrest, and that a cartridge casing was found in plain view.

Chattanooga Police Officer Victor Miller testified that he was the first responder at the convenience store and that Mr. Johnston provided him with a description of the car and the Defendant. After Mr. Johnston provided the license plate number, Officer Miller transmitted the number to other police officers in the area. Officer Miller heard on his police radio that the suspect's vehicle had been seen and said he left the convenience store to assist Officer Boller with the traffic stop. When he arrived at AutoZone, the Defendant was parking his car. He said the Camry and the license plate were consistent with Mr. Johnston's statement, but he noted the plate number contained one incorrect character. Although he could not recall the exact time, he knew less than thirty minutes had passed between the 9-1-1 call and the traffic stop.

Officer Miller testified relative to the identification that he stood between the police cars and provided backup to the other officers. He said Mr. Johnston arrived in a police car and was about twenty feet from the Defendant when Mr. Johnston identified the Defendant. He recalled that the parking lot was well lit and that he saw the Defendant's and the other officers' faces.

On cross-examination, Officer Miller testified that Officers Frisbee and Gaines and Sergeant Holloway were at the scene of the traffic stop. Although he heard Officer Frisbee and the Defendant talk about the Defendant's truck-driving-related work, he did not recall if the information was volunteered by the Defendant or provided after Officer Frisbee asked the Defendant about his work. He did not recall the Defendant's stating that Mr. Johnston attempted to run his car off the road or "pull over into his lane."

The trial court found that the show-up identification was permissible based upon its use during an "on-the-scene investigatory procedure shortly after the commission of the crime." The court found that within thirteen minutes of the 9-1-1 call, the Defendant was

-14-

located by the police driving a car matching the description provided by Mr. Johnston, that Mr. Johnston correctly provided six of the seven license plate numbers, that the license plate was from Pennsylvania as detailed by Mr. Johnston, which the court noted was uncommon in Hamilton County, and that Mr. Johnston was driven to the location of the show-up identification. The court found that the method of identification was not inherently suggestive. The court also found that the totality of circumstances did not show that the identification was unreliable based on Mr. Johnston's testimony that he obtained a clear view of the Defendant when the Defendant looked over his left shoulder and passed Mr. Johnston. The court noted that Mr. Johnston paid close attention to his surroundings after the first gunshot because he feared being shot at again. The court noted the detail and accuracy of Mr. Johnston's description of the Defendant and said the Defendant appeared in court with dark hair and a goatee. The court found that the 9-1-1 recording supported Mr. Johnston's testimony relative to the license plate and make and model of the Defendant's car. The court found that Mr. Johnston was certain in his identification of the Defendant at the scene and at the hearing. The court also considered the time between the offense and the identification and found that only minutes separated the events.

A witness's identification of a suspect "must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998). Although this court has noted that "[o]ne-to-one lineups are condemned and their use is highly suspect," under the proper circumstances show-up identifications remain permissible. *Marsh v. State*, 561 S.W.2d 767, 769 (Tenn. Crim. App. 1977) (citing *Stovall v. Denno*, 388 U.S. 293 (1967)); *see State v. Thomas*, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989). Generally, show-up identifications are prohibited unless "imperative circumstances . . . necessitate a showup, or . . . the showup occurs as an on-the-scene investigatory procedure shortly after the commission of the crime." *Thomas*, 780 S.W.2d at 381 (internal citations omitted). "It is the likelihood of misidentification that violates due process and renders [an] identification inadmissible." *State v. Philpott*, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994).

In determining whether an out-of-court identification is so impermissibly suggestive that it violates due process, trial courts should consider the totality of circumstances. *Neil v. Biggers*, 409 U.S. 188, 199 (1972). The relevant factors include

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id*. at 199-200. If a show-up identification is so impermissibly suggestive that it violates due process, the show-up identification and the in-court identifications are inadmissible. *Id*. at 199.

In the present case, the record reflects that the trial court considered the appropriate factors in determining that the show-up identification was not impermissibly or inherently suggestive based on the totality of the circumstances. The evidence shows that the police located the Defendant's car within approximately thirteen minutes of Mr. Johnston's 9-1-1 call. Likewise, the 9-1-1 recording reflects that the police officers arrived at the convenience store where Mr. Johnston was located before the 9-1-1 call ended. The Defendant was driving a car that matched the color, make, and model provided by Mr. Johnston. Likewise, the car had tinted windows and a Pennsylvania license plate, and the plate number Mr. Johnson provided to the officers and to the 9-1-1 dispatcher was correct save one character. Mr. Johnston's testimony is supported by the 9-1-1 call placed at the time of the shooting. We note that the Defendant was stopped on the same roadway Mr. Johnston reported seeing the Camry traveling after the car exited the interstate. Mr. Johnston testified that he obtained a clear view of the Defendant when he passed Mr. Johnston and looked over his left shoulder and when the Defendant looked in his rear-view mirror during the altercation before the shooting. Mr. Johnston testified that he paid close attention to his surroundings after he heard the gunshot because he feared being shot at again. Mr. Johnston also testified that the driver of the Camry was a Caucasian male with dark hair and a goatee, and the court noted the description was consistent with the Defendant's court appearance. The location of the show-up identification was about two miles from the convenience store and occurred approximately twenty minutes after the shooting. As a result, we conclude that Mr. Johnston's identification of the Defendant was reliable and not the product of inherently suggestive procedures. The court did not err by denying the motion to suppress.

## B. Warrantless Seizure

On November 19, 2012, a suppression hearing was held relative to items seized from the Defendant's car during the warrantless stop of the Defendant's car. He contended that the officers who stopped him had no direct knowledge that the alleged offense was a felony and that the officers had no legal basis to initiate a stop. Mr. Johnston provided similar testimony relative to the incident with the Defendant on the interstate. He said that after he realized someone shot at him, he stopped along the interstate to determine where the bullet entered his truck. Although he did not find anything during his exterior examination, he saw a bullet hole in the driver's seat. He sat in his seat and saw a bullet lodged in the rubber seal next to the window vent on the driver's door.

Mr. Johnston testified that he saw the Camry exit the interstate and called 9-1-1. He exited the interstate at the same location as the driver of the Camry but drove in the opposite direction from the exit ramp. He gave the police officers who responded to the convenience store a description of the car and the car's license plate number. He conceded the number he provided contained one incorrect character. Six police cars arrived at the convenience store, and Mr. Johnston described the incident with the Defendant to the officers and showed them the hole in his seat and the bullet lodged inside his truck. He said one of the officers found the hole where the bullet entered the exterior of the truck.

Mr. Johnston testified that several police officers left the convenience store and that two officers remained at the store. He said the other officers located the Camry less than ten minutes after leaving the store parking lot. An officer drove Mr. Johnston about one and one-half miles to the AutoZone parking lot where the Defendant had been detained.

On cross-examination, Mr. Johnston testified that Officer Frisbee removed the bullet from the interior of his truck. He did not recall giving the license plate number to the 9-1-1 dispatcher but said he provided it to the officers at the convenience store. He agreed the police officers first learned of the license plate number at the scene when he provided it to them.

On redirect examination, Mr. Johnston testified that no bullet holes were in his truck before June 30, 2010. He provided the police officers a description of the driver of the Camry and recalled telling the officers that the driver was a Caucasian male with dark brown hair and a goatee. After listening to the 9-1-1 recording, he agreed he told the dispatcher that the car had a Pennsylvania license plate, that he obtained the plate number, and that he identified the last four characters. He told the dispatcher what he thought were the first three characters. He said that it took about thirty or forty seconds to drive from the side of the interstate to the convenience store.

Chattanooga Police Officer Cornelius Gaines testified that Officers Frisbee and Miller were at the convenience store when he arrived. Although he did not speak to Mr. Johnston, he overheard Officer Frisbee talking to Mr. Johnston. Officer Gaines heard Mr. Johnston describe the car as a silver Toyota Camry with tinted windows and a Pennsylvania license plate and provide a license plate number. Officer Gaines saw a bullet hole through the cab of the truck. He left the convenience store and saw a silver Toyota Camry traveling southbound on Rossville Boulevard. Officer Gaines noted the car had tinted windows and a Pennsylvania license plate and said he relayed the plate number to Officer Frisbee. He noted the license plate number provided by Mr. Johnston contained one incorrect character. Officer Gaines conveyed to the other officers the direction the Camry was traveling and waited for additional officers to arrive before stopping the Camry. He waited for backup for

-17-

safety concerns because the alleged offense was violent and involved a gun. He said the Defendant was the only occupant in the car.

On cross-examination, Officer Gaines testified that he turned on his blue lights and that the Defendant pulled his car into a parking lot. The Defendant complied with Officer Gaines's commands. The officers searched the Defendant's car. Officer Gaines said that he saw the Defendant's car about thirty seconds after leaving the convenience store and that he knew the license plate number before he left the store parking lot.

The trial court found that Mr. Johnston believed that he had been shot at while traveling on the interstate, that he saw a bullet hole and a bullet in his vehicle, and that he told police officers what occurred and provided the officers with information when they arrived at the convenience store. Relative to the 9-1-1 recording, the court found that Mr. Johnston told the dispatcher about the shooting, his finding a bullet inside the cab of his truck, and the Pennsylvania license plate number. The court also found that Mr. Johnston told the police officers who responded to the convenience store what he thought occurred, which the court found would have been a felony, including aggravated assault, attempted homicide, and reckless endangerment. The court found that after Mr. Johnston provided the officers with the relevant information, Officer Gaines saw a bullet hole in the cab of the truck. Officer Gaines also saw a vehicle matching the description provided by Mr. Johnston and initiated a stop.

The trial court found that Officer Gaines had a reasonable and articulable suspicion that a crime had occurred based upon the information Mr. Johnston provided. The court found that the officer also had reasonable suspicion that the driver of the car he saw had committed the alleged crime because the car matched the description, the license plate, and the color Mr. Johnson provided. Relying on Tennessee Code Annotated section 40-7-103, grounds for making an arrest without a warrant, the court denied the motion to suppress.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. Warrantless seizures are "presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the . . . seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997); *see Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000).

A law enforcement officer's initiating a traffic stop constitutes a seizure pursuant to the United States and Tennessee Constitutions. *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *see Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *see also State v. Vineyard*, 958 S.W.2d 730, 734 (Tenn. 1997); *State v. Pulley*, 863 S.W.2d 29, 30 (Tenn. 1993). However, a police officer is permitted to initiate a traffic stop without a warrant for the purpose of a brief investigatory stop based upon "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *see Binnette*, 33 S.W.3d at 218. The objective standard for determining whether a police officer has specific and articulable facts that a suspect has committed a crime or is about to commit a crime focuses on whether "the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate[.]" *Terry*, 392 U.S. at 21-22 (internal quotation marks and citations omitted); *see State v. Garcia*, 123 S.W.3d 335, 344 (Tenn. 2003). "Reasonable suspicion is a particularized . . . basis for suspecting the subject of a stop of criminal activity, and it is determined by considering the totality of the circumstances surrounding the stop." *Binette*, 33 S.W.3d at 218 (internal citations omitted). This determination includes considerations relative to "'(i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and experience.'" *Pulley*, 863 S.W.2d at 34 (quoting *United States v. Mendenhall*, 446 U.S. 544, 561 (1980) (Powell, J., concurring)). The objective facts upon which the officer relied includes, but is not limited to, the officer's observations, information received from fellow officers, information received from citizens, and the "pattern of operation of certain offenders." *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992).

We conclude that Officer Gaines had reasonable and articulable suspicion to believe that the Defendant had committed a criminal offense, which permitted the officer to conduct an investigatory stop. Officer Gaines testified that he overheard Mr. Johnston talking to Officer Frisbee about the incident on the interstate and the shooting that followed. Officer Gaines learned from Mr. Johnston that the car involved in the incident and shooting was a silver Toyota Camry with tinted windows and a Pennsylvania license plate. Officer Gaines also learned the license plate number provided by Mr. Johnston and observed the bullet hole in the cab of the truck's sleeping compartment. Upon learning of the incident, the shooting, and the information relative to the Camry and observing the bullet hole in the truck, Officer Gaines left the convenience store where Mr. Johnston and additional officers were located to look for the Camry. Officer Gaines observed a car matching the description of the car Mr. Johnson provided and said the car had tinted windows and a Pennsylvania license plate. Officer Gaines conveyed the plate number to Officer Frisbee. The number Mr. Johnston provided was the same except for one character.

Officer Gaines had reasonable and articulable suspicion to believe that the driver of the Camry had committed a crime based on the information Officer Gaines learned from the victim. Officer Gaines's personal observation of the bullet hole in the cab of the truck and Mr. Johnston's statement provided Officer Gaines sufficient information to believe that a shooting occurred on the interstate, and the trial court properly noted that the conduct would have been a felony offense. Upon observing the Camry on the same roadway the victim reported seeing the car travel, Officer Gaines confirmed the Pennsylvania license plate number. Although one character of the license plate number Mr. Johnston provided was incorrect, we conclude that Officer Gaines had sufficient information to initiate a traffic stop. *See State v. Hanning*, 296 S.W.3d 44, 51-55 (Tenn. 2009). We, likewise, conclude that the information he learned before observing the Camry provided Officer Gaines with sufficient specific and articulable facts to believe the driver had committed a felony based on the use of a firearm while traveling on the interstate and the victim's nearly being struck by the bullet. *See* T.C.A. § 40-7-103(a)(2), (3) (2006) (amended 2012) (stating that "[w]hen the person has committed a felony, though not in the officer's presence" and "[w]hen a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested has committed the felony," the officer may arrest the person without a warrant).

## III

### Hearsay Evidence

The Defendant contends that the trial court erred by admitting inadmissible hearsay evidence. He argues that Mr. Johnston's testimony that another truck driver on the roadway at the time of the shooting transmitted over the CB radio, "Did he just shoot at you?" or "Is he shooting at you?" was inadmissible hearsay and violated his confrontation rights. The State responds that the statement was admissible as an excited utterance and that the Defendant's confrontation rights were not implicated by the evidence.

Trial counsel filed a motion in limine requesting the trial court prohibit Mr. Johnston from testifying relative to statements he heard on the CB radio about his being shot at by another driver on the roadway. Counsel argued that the evidence was hearsay and violated the Defendant's confrontation rights. A transcript of the motion hearing is not contained in the record, and the court minutes only reflect that a hearing was held and that the motion was denied. Counsel did not object at the trial during the relevant testimony. At the hearing on the motion for a new trial, the prosecutor reminded the court that it ruled the relevant testimony was an excited utterance and did not violate the Confrontation Clause because the testimony was non-testimonial and was "not made during the course of the investigation in any way."

Neither the Defendant nor the State cites to the appellate record relative to the trial court's findings of fact and conclusions of law relative to the motion in limine, and a transcript of the motion hearing is absent from the record. The Defendant has the burden of preparing a fair, accurate, and complete record on appeal. *See* T.R.A.P. 24(b); *see also State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). When a "record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, . . . an appellate court is precluded from considering the issue." *Ballard*, 855 S.W.2d at 560-61 (citing *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988)). "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). The Defendant is not entitled to relief on this basis.

## IV

### Photograph Exhibits

The Defendant contends that the trial court erred by admitting in evidence two groups of photographs. He argues that the photographs should have been excluded pursuant to Tennessee Rule of Evidence 403 because of "the problems with the untimely nature of the" photographs. The State responds that the court did not abuse its discretion.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

On May 7, 2013, trial counsel filed a motion in limine requesting the trial court exclude a group of photographs depicting Mr. Johnston's truck. Counsel alleged that the photographs were taken by Mr. Johnston's wife on July 2, 2010, that the photographs were staged, and that law enforcement was not involved in obtaining the photographs. Counsel moved to exclude all of the photographs depicting Mr. Johnston sitting inside his truck because the prejudicial nature outweighed the probative value. Counsel contended the purpose of the photographs was to show that a bullet struck the truck but argued the "staged nature" made them inadmissible pursuant to Tennessee Rules of Evidence 401 and 403. Two photographs depicted a hole in the driver's seat while Mr. Johnston sat on the seat. The hole in the driver's seat was indicated by an ink pen inserted through the hole. Two photographs showed the rear side of the truck's cab where the sleeping compartment was located. The remaining photographs showed Mr. Johnston's truck generally.

Trial counsel also argued in his motion in limine that a second group of photographs were taken by "an unknown person of the semi trailer and truck." Counsel alleged that the photographs were taken in March 2011 and that they were not taken on the date of the offense or by law enforcement. Counsel argued the photographs were inadmissible pursuant to Tennessee Rule of Evidence 402. Our review of the record shows that one of the exhibits identified in the Defendant's brief was an enlarged aerial map of the area and another exhibit was the 9-1-1 recording. The remaining exhibits at issue in the second group of photographs included two photographs of the hole on the rear exterior of the truck at the sleeping compartment showing an ink pen inserted through the hole and three photographs of holes through the jackets draped around the driver's seat of the truck with objects inserted through the holes. The remaining photographs showed the interior of the truck where the bullet stuck in the rubber seal of the window vent.

Neither the Defendant nor the State cite to the record relative to the trial court's findings of fact and conclusions of law relative to the motion in limine, and a transcript of any motion hearing is absent from the record. The record does not reflect that the court entered an order relative to the motion. Likewise, no court minute entry exists in the record. We note that the Defendant's brief only states that the motion "specifically pointed out the problems with the untimely nature" of the photographs.

At the trial, however, a jury-out hearing was held regarding the first group of photographs, which included nine photographs. Trial counsel first objected to two photographs, arguing that the photographs were irrelevant and prejudicial. The photographs depicted Mr. Johnston sitting in the driver's seat and an ink pen inserted through the hole in the headrest created by the bullet trajectory. Counsel argued that the photographs were staged and were not taken by law enforcement or on the day of the incident. Counsel also argued that the probative value of the photographs was outweighed by the unfair prejudice. The trial court reviewed the charges against the Defendant and found that the alleged location of a bullet hole in the seat where the victim was sitting while driving was relevant. The court found that the photographs were highly probative of the issue of intent for each charged offense. The court noted that any injury to Mr. Johnston could have caused danger to the public. The court said that although the photographs were not taken on the day of the incident, there were not many "locations . . . [to] sit in a seat," regardless of when the photographs were taken. The court found that the probative value substantially outweighed any unfair prejudice. Later, when the prosecutor attempted to enter the photographs in evidence, the trial court stated, "Any objection will be noted, [counsel], if you persist in what you mentioned earlier." Counsel responded, "I do persist," and the photographs were received as exhibits.

The remaining photographs in the first group depicted the exterior of the truck. Two photographs showed the location where the bullet entered the rear of the sleeping compartment of the truck and the other photographs showed various angles of the truck. Trial counsel argued that the photographs were untimely and taken about nine months after the incident. Counsel did not know who took the photographs, although he knew the police did not take them. The trial court found that when and who took the photographs were related to the proper foundation, that the State was required to establish the proper foundation at the trial, and that the depictions in the photographs were relevant to establishing the Defendant's intent. The court found that probative value was the size of the truck and the location in which the bullet entered the truck. The court noted that any prejudice was substantially outweighed by the probative value.

We conclude that the trial court did not abuse its discretion by admitting the photographs. The court properly found that the photographs showed the location where the bullet entered the truck and where the bullet traveled after it entered the truck and that the bullet's traveling through Mr. Johnston's truck and headrest were relevant to the Defendant's intent. The Defendant is not entitled to relief on this basis.

Relative to the second group of photographs, the record reflects that the photographs were not addressed at the jury-out hearing, that trial counsel did not object to their admission at the time they were offered by the prosecutor, and that no discussion was had relative to any previous objection. The photographs were admitted without comment. The Defendant's failure to object at the time of admission results in waiver of the issue. *See* T.R.A.P. 36(a); Tenn. R. Evid. 103(a)(1). The Defendant is not entitled to relief on this basis.

V

**Prosecutorial Misconduct**

The Defendant contends that the prosecutor engaged in prosecutorial misconduct during his closing argument by making misleading and prejudicial statements about what the Defendant wanted the jury to believe the evidence showed, which he interprets as a comment on the Defendant's decision not to testify. He also argues that the prosecutor misstated the evidence relative to the ballistics analyses.

The record reflects that the prosecutor made the following statements during his closing argument:

Mr. Volpe continues to want you to think, "Well, [the bullet] comes from this dangerous part of the city, Eastlake Courts," because, see, all he needs is just one of you, ladies and gentlemen, just one of you to have some doubt about what actually happened out there.

So think about things that don't make any sense. That's what Mr. Volpe wants you to do. Mr. Vople wants you to focus on the evidence that you don't have. He doesn't want you to look at the proof that's actually been presented, the uncontroverted proof that's been presented to you.

. . . .

Now, Mr. Volpe wants you to believe it all started with Mr. Johnston's actions.

. . . .

Now, understand . . . what Mr. Volpe wants you to believe, he wants you to believe . . . that in this one section of interstate, from the top to where they are, that somebody else fired from the location exactly where Volpe would have been coming down the ridge cut at Mr. Johnston as he drove down the ridge cut. Why in the world would anybody else shoot at a random truck driving down the ridge cut? It makes absolutely no sense.

. . . .

Ladies and Gentlemen, that's not reasonable doubt. That's Mr. Volpe trying to submit to you some far-fetched explanation for his behavior.

Relative to the prosecutor's misstating the evidence, the Defendant points to the prosecutor's commenting on trial counsel's "wanting to say" that the Defendant's car was never in the middle lane and could not have been beside Mr. Johnston's truck. The Defendant contends the record does not show counsel made such a statement. The Defendant also contends that the prosecutor misstated Agent Brodhag's testimony relative to the class characteristics.

The record reflects that the Defendant did not object to the prosecutor's closing argument, and as a result, the State contends that the issue is waived and that he is not entitled to plain error relief because no clear and unequivocal rule of law was breached. The Defendant's failure to object during the prosecutor's closing argument results in waiver of

the issue. *See State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992); *see also* T.R.A.P. 36(a) (stating "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Therefore, our review is limited to determining whether the Defendant is entitled to plain error relief.

> Five factors are relevant
>
> > when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must exist in order for plain error to be recognized. *Id.* at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id*. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

We conclude that the Defendant is not entitled to plain error relief because the record does not reflect the prosecutor's statements were comments on the Defendant's choosing not to testify and does not reflect that the prosecutor misstated the evidence. Rather, the record reflects the prosecutor's statements were in response to trial counsel's closing argument, were about the evidence presented, and were based on witness testimony. We conclude that a clear and unequivocal rule of law was not breached and that the Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE